Ernest E. Suggs and Marjorie S. Suggs v. Commissioner. Grover C. Suggs and Stella Suggs v. Commissioner.
Suggs v. Commissioner
Docket Nos. 4351-63, 4352-63.
United States Tax Court
T.C. Memo 1965-235; 1965 Tax Ct. Memo LEXIS 94; 24 T.C.M. (CCH) 1194; T.C.M. (RIA) 65235; August 30, 1965
*94 Robert D. Collins and Harold W. Wales, 800 Title and Trust Bldg., Phoenix, Arizona, for the petitioners. Eugene H. Ciranni, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in petitioners' income tax in these consolidated dockets as follows: Addition to Tax
Docket
Sec. 6651(a),
No.
Year
Deficiency
I.R.C. 1954
4351-63
1960
$7,706.49
$1,926.62
4352-63
1960
6,387.22
The main issue is the correctness of respondent's determination that in a sale transaction of the Suggs Insurance Agency (a partnership), the seller received $50,250 as consideration for an agreement not to compete. A few weeks before trial petitioners amended their petition to allege respondent erred in failing to exclude $6,700 from the ordinary net income of the Suggs Insurance Agency, which had been allocated to the seller in the sales agreement for services to be rendered to the purchaser, incident to retaining renewals. Findings of Fact Some of the facts have been stipulated and they will be found accordingly. Grover C. Suggs began a general insurance business in Phoenix, Arizona, *95 in 1935 under the name of Suggs Insurance Agency. The business continued under the same name and in 1948 an equal partnership was formed between Grover and his two sons, Ernest and Hugh. When Hugh died in 1957 the business continued under the same name with Grover and his son Ernest equal partners. On August 1, 1960 Grover and Ernest sold their insurance business to Norbert Cronin & Co., Insurance Agency, upon an Agreement of Sale executed by the sellers and purchaser which provided in paragraph 11, as follows: 11. The Buyer hereby purchases the above described business and property from the Seller and agrees to pay therefor to the Seller, their heirs, executors, administrators or assigns the following considerations: a. The Sum of $10,050.00 for the renewals (goodwill) of the aforesaid business. b. The Sum of $50,250.00 because of the restricting covenant outlined in Paragraph 3 hereof. c. The Sum of $6,700.00 for the services rendered and to be rendered by the Seller to the Buyer as outlined in Paragraph 7 hereof. In addition, Five Thousand Dollars ($5,000.00) will be paid by the Buyer for all furniture, fixtures, and equipment, etc., including heating and cooling apparatus *96 now installed and operating in the premises at 5032 North Central Avenue, Phoenix, Arizona. It is agreed that One Thousand Dollars ($1,000.00) is hereby acknowledged with the signing of this Agreement, and that the balance of the total purchase price of $72,000.00 is to be paid as follows: Nine Thousand Dollars ($9,000.00) on August 1, 1960; Ten Thousand Dollars ($10,000.00) on September 1, 1960, and Ten Thousand Dollars ($10,000.00) on October 1, 1960. The remaining $42,000.00 will be paid in thirty-six (36) consecutive equal monthly installments commencing January 1, 1961. Paragraph 3 of the agreement of sale, which is referred to in paragraph 11 quoted above, provides in material part, as follows: 3. The Seller further agrees that they will not for a period of five years from the date of this contract, directly or indirectly or indirectly, engage in business as a general insurance agent within a radius of 100 miles of Phoenix, Arizona, nor aid, nor assist anyone else in said business in said territory, except that it is agreed that Seller may retain their Insurance Agent's Licenses, and that as to insurance sold to any new accounts, such business shall be placed only through *97 the office of the Buyer, the Seller to be compensated on the basis of fifty percent (50%) of the commission payable on the entire premium, whether paid in advance or paid in monthly, quarterly, semi-annual or annual installments. Paragraph 7 of the agreement of sale, which is also referred to in paragraph 11 above, is as follows: 7. The Seller agrees to render such reasonable assistance as may be necessary to the Buyer to assist him to hold the first renewal of said business. The partnership of Suggs Insurance Agency treated the $50,250 mentioned in the contract as being for the restrictive covenant as included in the selling price of good will and its partnership return reflected this treatment showing the $50,250 as long-term capital gain. Respondent determined the $50,250 was for the covenant not to compete and was taxable as ordinary income and therefore the partnership's ordinary income was increased. Respondent's determinations of deficiencies in the joint returns of Ernest and Grover and their spouses, Marjorie and Stella, respectively (which were filed with the district director in Phoenix), result from his increasing the partnership ordinary income. Opinion Respondent *98 has determined the $50,250 constitutes ordinary income to the petitioners and petitioners admit on brief the determination is correct "if in fact such an amount was paid for the undertaking not to engage in the insurance business as a general insurance agent." Petitioners also recognize on brief that the assignment of values in paragraph 11 of the Agreement of Sale wherein $50,250 is stated to be for the undertaking by petitioners not to engage for a period of five years from the date of the sale of the agency as a general insurance agent within a 100 mile radius of Phoenix "places upon them an onerous burden, and strong proof should be adduced to overcome this assignment of value." That this is so, see , [1] affirming . Petitioners have put the issue in proper perspective so our inquiry is whether the evidence sustains the fact conclusion they draw, i.e. that there actually was no agreement that the restrictive covenant would have an assigned value of $50,250 of the purchase price. *99 Ernest Suggs, who carried on most all of the negotiations for the sellers, testified that he understood from the outset that the final agreement of sale would have a restrictive covenant in it. He told of how he and Norbert Cronin, who represented the purchaser, had bargained over the length of the covenant as the buyer wanted a seven year restrictive covenant and he wanted a three year period and that they finally agreed to the five year period. He admitted that a restrictive covenant in the sale of such an insurance agency as his was "fair-and-logical". He had purchased an insurance agency once and he had seen to it that there was a restrictive covenant in the sale contract though there was no attribution of any portion of the purchase price to the covenant. It seems to be petitioners' argument that the allocation of $50,250 for the restrictive covenant was not the result of prior negotiations and that it was a sum inserted into the agreement by the tax-conscious buyer and went unnoticed by the tax-ignorant sellers. The evidence as a whole just does not support this contention. There is one piece of documentary evidence which is some support for petitioners' position. It is a *100 letter to the sellers signed by the purchaser transmitting, for the sellers signatures, what is called in the letter a "Buy and Sell" agreement and the letter contains a paragraph that reads: "I have shown the purchase price of the accounts themselves to be $67,000 plus $5,000 for all furniture, fixtures, equipment, etc.". However, the only evidence there is about what was enclosed with the letter is that it was a draft of the Agreement of Sale contract containing the paragraph 11 allocations set forth in the contract that was finally executed. We are satisfied from all of the evidence that both parties intended some allocation of the purchase price to the covenant not to compete. Cronin testified that he had carefully investigated the character of Grover and Ernest Suggs. He found that their reputation in Phoenix was excellent. They were organizers and charter members of the Arizona Country Club in Phoenix. Ernest Suggs' wife, Marjorie, had been voted Woman of the Year in 1951 by the Phoenix Chamber of Commerce. Cronin testified the restrictive covenant was the "all-important thing" if he was to hold the business and that he would not have bought the business without such a covenant. *101 The Suggs agency was a personal insurance business satisfying mostly the insurance needs (other than life) for individuals as distinguished from businesses in the Phoenix area. It is readily understandable that the permanent sale of such a business would involve a covenant that the sellers would not compete. Cronin testified that he discussed the allocation of the $67,000 that was being paid (for other than the furniture and fixtures) with Ernest and they agreed it would be 15 percent for the good will, 75 percent for the restrictive covenant and 10 percent for the services. He testified he had both bought and sold other insurance agencies on written contracts with the same percentage allocation of the purchase price. It is without dispute that the sale contract here involved was first prepared by the buyer and sent to the sellers. Ernest Suggs took the contract to his lawyer in its unsigned form. The lawyer was not a tax attorney. He suggested some minor changes and it was executed with the paragraph 11 allocations as heretofore set forth. It may well be that the sellers either did not know or entirely overlooked the tax consequences of the allocations in paragraph 11, but that *102 is immaterial as long as the contract was otherwise fully understood by the parties. , affd. . What we have said with respect to the allocation for the restrictive covenant applies with equal force to the allocation of $6,700 for services. This was not questioned in the original petitions filed September 11, 1963. It was not until the amendments were filed in March of 1965 that petitioners asserted this sum should also be allocated to the sale of good will along with the $50,250 and $10,050, making a total of $67,000 to be allocated to good will. Ernest testified there was no discussion as to any assignment of value to the services he was to perform. However, it appears without dispute that there was discussion between Ernest and Cronin as to the services Cronin would expect the sellers to perform to help accomplish the business transfer. Grover was not asked to perform any services and Ernest testified he actually did perform the services requested, which were designed to enable the purchaser to retain the renewals, but the services were nominal and occupied no more than a few hours of his time. Again *103 we must accept the contract as written. It is without dispute that there should be some allocation for the value of services to be performed. The value agreed upon as evidenced by the executed contract is all we have to measure the tax. The fact that it falls heavier on the sellers than they expected or that when viewed later, the services they actually performed pursuant to the purchaser's request seem out of proportion to the allocated value, is immaterial. We hold for respondent on the issues presented. Decisions will be entered for the respondent. Footnotes
1. In the cited opinion it is stated: The burden of proof in the Tax Court is on the taxpayer, [citation omitted] and we agree with the Tenth Circuit in their decision in Hamlin's Trust v. C.I.R. [citation omitted] that when the parties to a transaction such as this one have specifically set out the covenants in the contract and have there given them an assigned value, strong proof must be adduced by them in order to overcome that declaration. The tax avoidance desires of the buyer and seller in such a situation are ordinarily antithetical, forcing them, in most cases, to agree upon a treatment which reflects the parties' true intent with reference to the covenants, and the true value of them in money.↩